# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-10505

United States Court of Appeals
Fifth Circuit

**FILED**

July 10, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

>    Plaintiff – Appellee,

v.

MOHAMED TOURE; DENISE CROS-TOURE,

>    Defendants – Appellants.

Appeals from the United States District Court
for the Northern District of Texas

Before DENNIS, ELROD, and COSTA, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Mohamed Toure and Denise Cros-Toure appeal from the district court's judgment convicting them of forced labor, conspiracy to harbor an alien for financial gain, and harboring an alien. We affirm.

I.

Mohamed Toure and Denise Cros-Toure are a married couple who came to the United States from Guinea.[1] Upon securing green cards, they became

---

[1] We view the facts in the light most favorable to the verdict, as we must. *United States v. Martinez*, 900 F.3d 721, 728 (5th Cir. 2018).

No. 19-10505

lawful permanent residents. The Toures resided in Southlake, Texas, with their five children.

D.D. was born in Guinea. She lived in a village with her family until her father took her to Conakry, the capital of Guinea, to live with and work for Denise Cros-Toure's parents. When D.D.'s mother learned of the arrangement, she unsuccessfully attempted to hide D.D. with a relative because she did not "want [D.D.] to become somebody's slave." While living with Denise Cros-Toure's parents, D.D. stopped going to school. Instead of continuing her education, D.D. performed tasks such as taking care of Denise Cros-Toure's blind sister and giving massages to her mother.

In January 2000, D.D. was sent to live and work in Mohamed Toure and Denise Cros-Toure's home in Southlake, Texas. She was around nine or ten years old. D.D. had no choice in the matter. According to Mohamed Toure, D.D.'s father "decided to give—I mean, to let [them] have" D.D. To facilitate the move, Denise Cros-Toure's parents obtained a passport and tourist visa for D.D. Although D.D.'s visa authorized her to stay lawfully in the United States for six months, until July 18, 2000, she lived with the Toures until 2016.

Over the next sixteen years, D.D. worked for the Toures in their home. She performed a wide variety of tasks for the family, often working from around 6:30 or 7:00 a.m. to 8:00 or 9:00 p.m. every day. While working, D.D. was not allowed to take many breaks. One of her main jobs was to cook meals for the Toures. D.D. was also responsible for taking care of the Toures' children during the day, performing tasks such as changing diapers. When the children grew older, D.D. had to walk them to school. While the children were at school, D.D. cleaned the Toures' house at Denise Cros-Toure's direction. D.D. would also shop for the Toures, walking or biking about a mile and a half to the nearest grocery store to do so. In addition, the Toures tasked D.D. with fixing household appliances, landscaping, and yardwork. D.D. also completed major

2

household renovations, including painting the exterior of the home and helping remodel the kitchen. At night, D.D. massaged Denise Cros-Toure's back and feet. On top of her work for the Toures, D.D. also cooked for and served the Toures' houseguests and watched over their children. At no point did the Toures ever pay D.D. for her labor. Instead, D.D. obtained money through occasional gifts, babysitting, and doing odd jobs for neighbors.

The Toures did not treat D.D. as if she were one of their own children. While the Toures' children received an education, D.D. was never allowed to attend school. The Toures claim that they considered education options for D.D., but they did not enroll her in school because they thought she needed to have "papers." The Toures did not home-school D.D. either, even though they did not work outside the home for most of the time that D.D. lived with them. During mealtimes, D.D. ate alone at the kitchen counter after the family had finished eating together at the dining table. The defendants celebrated their children's birthdays but never D.D.'s. They displayed photos of their children in the home but none of D.D. Denise Cros-Toure even made D.D. wash her clothes separately from the laundry D.D. did for the rest of the family.

D.D. also suffered from medical neglect. The Toures provided routine medical care, dental care, and orthodontia for their own children but not for D.D. In fact, the Toures never took D.D. to see a doctor and took her to see a dentist only once, despite her suffering from serious dental problems that resulted in the loss of three adult teeth. On one occasion, D.D. had to extract one of her own front teeth after it was partially dislodged in a fall at the Toures' home. Next, after one of D.D.'s back teeth became infected and untreatable with home remedies, Mohamed Toure took her to a dental clinic (instead of the family dentist), where he paid cash for the tooth to be removed. Later, when a second back tooth became infected, D.D. removed it herself with pliers.

In addition to disparate treatment and neglect, D.D. suffered from physical violence at the hands of the Toures. They frequently beat her—with a belt, an electrical cord, a bottle, even a spoon. Once, when D.D. disrupted a sleeping houseguest with her work, Denise Cros-Toure punished D.D. by ripping her earring through her ear, permanently splitting D.D.'s earlobe. Later, Denise Cros-Toure ripped another earring through D.D.'s other earlobe and pulled out her hair, leaving D.D. with a bald spot. Mohamed Toure also beat D.D. after she talked back to his mother and later sat on D.D.'s back to hold her in place while his wife beat her.

The Toures would punish D.D., too, by banishing her from the house on multiple occasions, during which she would stay alone at a local park. On one such occasion, police officers found D.D. alone at the park, but she was unable to communicate with them in English. After figuring out where D.D. lived, the police officers brought her to the Toures' home. Mohamed Toure was unable to provide the police with a date of birth for D.D. when questioned, and he was evasive in explaining her connection to the family. Once the officers left, Denise Cros-Toure scolded D.D. for bringing the police to the house. During a subsequent banishment, D.D. stayed at a public park for a week, sleeping on a bench and using the hand dryer in a public bathroom to stay warm.

The Toures further punished D.D. through humiliation. Once, when she was displeased with how D.D. maintained her hair, Denise Cros-Toure had Mohamed Toure shave D.D.'s head. Another time, Denise Cros-Toure told D.D. that she smelled bad and hosed her down in the back yard, commenting to her husband that D.D. was so dirty that the soap would not foam. On other occasions, Denise Cros-Toure called D.D. "[e]very name you can imagine," including "dog, slave, idiot, worthless, [and] useless."

The Toures took steps to isolate D.D. and restrict her access to the outside world. In addition to taking D.D.'s passport and visa when she arrived

in the United States, the Toures never obtained new identification or immigration documents for D.D. once these expired. When asked about D.D., the Toures told some people that she was their niece, while telling others that she was an orphan. Although D.D. was allowed to roam around the neighborhood, she could do so only after getting permission from Denise Cros-Toure. Furthermore, D.D. did not have a cell phone, and the Toures did not teach her to use the family's landline or allow her to call her parents once she arrived. The Toures also prevented D.D. from learning to read and write. For example, when a family friend told the Toures about a school that would accept D.D. without identification documents and offered to help transport her there, the Toures still decided not to enroll her. When D.D. took a *Hooked on Phonics* book that belonged to one of the Toures' children, Denise Cros-Toure got angry and made D.D. return it.

In 2016, a series of events compelled D.D. to flee the Toures' home. First, D.D. overheard a visiting family member ask Denise Cros-Toure if she could have D.D. when she was done with her. Second, Denise Cros-Toure attacked D.D. for talking back to Mohamed Toure, punching and choking D.D. until her husband and one of their sons intervened.

Following this attack, D.D. fled the Toures' house and went to stay with a family friend. While there, D.D. revealed how the Toures abused her. When the family friend asked D.D. if she wanted to contact the authorities, D.D. chose to return to the Toures' home because she feared involving the police. When the family friend brought D.D. back to the Toures and inquired about the abuse, they denied ever mistreating D.D. Once the family friend left, the Toures confronted D.D. Denise Cros-Toure made D.D. apologize for leaving and talking to the family friend, berated D.D. for being ungrateful, told D.D. to leave the house and stay at the park, and said that she did not care if D.D. were raped or killed. Denise Cros-Toure also dared D.D. to go to the police,

stating that she would meet D.D. there and that the neighbors would support the Toures. When D.D. asked the Toures to send her back to Guinea, Denise Cros-Toure said she would not pay for D.D.'s travel. Later, Denise Cros-Toure angrily told D.D. that "you need to be working in this house . . . you came here for that," and that "[her] house needs to be clean" before she would send D.D. back to Guinea.

Eventually, D.D. was able to communicate with an acquaintance who arranged for a former neighbor to collect D.D. from the Toures' home. D.D. then made her way to Houston, where the Y.M.C.A. put her in touch with the Houston Human Trafficking Task Force. In his interview with law enforcement, Mohamed Toure described D.D.'s departure as an "escape," and commented that he did not "turn her in" to the authorities when she left. He also admitted that he did not know where D.D. was staying, did not know how to contact her, and did not contact the police when she disappeared.

On September 19, 2018, a federal grand jury returned a five-count indictment against the defendants. The indictment charged each defendant with: (1) conspiracy to commit forced labor in violation of 18 U.S.C. §§ 1589 and 1594(b); (2) forced labor in violation of 18 U.S.C. §§ 2, 1589, and 1594(a); (3) conspiracy to harbor an alien for financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i); and (4) harboring an alien for financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i). The indictment also charged Mohamed Toure with (5) making a false statement to a federal agent in violation of 18 U.S.C. § 1001(a)(2).

The case proceeded to trial. At the close of the government's case, the defendants moved for judgments of acquittal based on insufficient evidence. The district court deferred ruling on the motion until after trial. Before announcing the jury's verdict, the district court denied the defendants' motions for judgments of acquittal. The jury found both defendants guilty of forced

labor; conspiracy to harbor an alien for financial gain; and harboring an alien, a lesser included offense of harboring an alien for financial gain. The jury acquitted the defendants of all other charges. The district court sentenced Mohamed Toure and Denise Cros-Toure to eighty-four months of imprisonment and made each defendant jointly and severally liable for a restitution award of $288,620.24.

The defendants now appeal their convictions, raising four issues: (1) their forced-labor conviction under § 1589 should be vacated because the statute's definition of "serious harm" is unconstitutionally vague or overbroad; (2) the evidence was insufficient to support Mohamed Toure's conviction of forced labor; (3) the district court abused its discretion by failing to give the defendants' requested jury instruction; and (4) the district court erred in imposing a restitution award of $288,620.24. We address each of these issues in turn.

## II.

The defendants first argue that their forced-labor conviction under § 1589 should be vacated because the statute's definition of "serious harm" is unconstitutionally vague or overbroad. We disagree.

The forced-labor statute, known as the Victims of Trafficking and Violence Protection Act (TVPA), punishes anyone who "knowingly provides or obtains the labor or services of a person" through one or more of several prohibited means. 18 U.S.C. § 1589. Per the statute's 2008 amendment, these means include, in relevant part, "serious harm or threats of serious harm to that person or another person," *id.* § 1589(a)(2), or a "scheme, plan, or pattern" intended to make the person believe that she or someone else will "suffer serious harm or physical restraint" unless she performs the desired labor or services, *id.* § 1589(a)(4). The 2008 amendment also defines "serious harm" as:

any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

*Id.* § 1589(c)(2).

Because the defendants raise this issue for the first time on appeal, we apply plain-error review. *See United States v. Rojas*, 812 F.3d 382, 390–91 (5th Cir. 2016) (reviewing for plain error a constitutional challenge to a statute raised for the first time on appeal). Under the stringent standard of plain-error review, we "will reverse only if '(1) there is an error, (2) that is clear or obvious, and (3) that affects [the defendant's] substantial rights.'" *Id.* at 391 (quoting *United States v. Ferguson*, 211 F.3d 878, 886 (5th Cir. 2000)). An error is "clear" or "obvious" only if it is clear "under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993); *see also United States v. Escalante-Reyes*, 689 F.3d 415, 418–19 (5th Cir. 2012) (en banc). When all three prongs are satisfied, we will exercise our discretion to correct the error only if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Rojas*, 812 F.3d at 391 (quoting *Olano*, 507 U.S. at 736).

We need only address the second prong. The defendants have failed to identify any authority holding that under current law—the standard they must meet on plain-error review—the forced-labor statute's definition of "serious harm" is unconstitutionally vague or overbroad. Indeed, no court has ever held that § 1589's definition of "serious harm" is unconstitutional. In fact, the courts that have addressed this issue have held the opposite. *See United States v. Calimlim*, 538 F.3d 706, 710–13 (7th Cir. 2008) (holding that § 1589 is neither unconstitutionally vague nor overbroad); *United States v. Wiggins*, No. EP-11-CR-2420, 2013 WL 12196743, at *2 (W.D. Tex. Mar. 5, 2013) ("The

court . . . concludes that the counts invoking Sections 1589 and 1591 are not unconstitutionally vague."); *United States v. Sou*, No. 09-00345, 2011 WL 3207265, at \*5–8 (D. Haw. July 26, 2011); *United States v. Askarkhodjaev*, No. 09-00143-01, 2010 WL 4038783, at \*2–6 (W.D. Mo. Sept. 23, 2010), *adopted by*, 2010 WL 4038745 (W.D. Mo. Oct. 4, 2010); *United States v. Garcia*, No. 02-CR-110S-01, 2003 WL 22956917, at \*2–6 (W.D.N.Y. Dec. 2, 2003).

The defendants do not cite a single case holding otherwise. Because they cannot show that the error (assuming there is one) is "clear or obvious," their challenge on this point fails. *See, e.g.*, *United States v. Parsons*, 134 F. App'x 743, 743 (5th Cir. 2005) ("Given the lack of controlling authority on this particular vagueness issue, any error on the part of the district court was not clear or obvious and could not have been plain error."); *United States v. Calverley*, 37 F.3d 160, 165 (5th Cir. 1994) (en banc) ("The uncertainty manifest in this area of the law illustrates that any error on the part of the trial court could not be plain.").

## III.

Mohamed Toure next argues that the evidence was insufficient to support his forced-labor conviction.[2] This argument also fails.

We review *de novo* a district court's denial of a motion for judgment of acquittal based on insufficient evidence. *United States v. Reed*, 908 F.3d 102, 123 (5th Cir. 2018). However, such challenges are considered "with substantial deference to the jury verdict." *United States v. Evans*, 892 F.3d 692, 702 (5th Cir. 2018). We must affirm the jury verdict "if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt." *Reed*, 908 F.3d at 123. When making this

---

[2] Only Mohamed Toure—not Denise Cros-Toure—argues that the evidence was insufficient to support his conviction.

determination, we "view the evidence in the light most favorable to the verdict and draw all reasonable inferences from the evidence to support the verdict." *Id.*

To establish that Mohamed Toure violated § 1589, as charged, the government was required to prove beyond a reasonable doubt that he: (1) "provided or obtained the labor or services of [D.D]"; (2) did so either by "threats of serious harm" or "a scheme, plan, or pattern intended to cause [D.D.] to believe that, if [D.D] did not perform such labor or services, [D.D] would suffer serious harm"; and (3) did so "knowingly." Mohamed Toure contests only the second and third elements. In other words, he admits that he obtained D.D.'s labor or services but claims that he did not knowingly do so by prohibited means. Section 1589(c)(2) defines "serious harm" as harm that is "physical or nonphysical, including psychological, financial, or reputational harm," the seriousness of which is viewed "under all the surrounding circumstances" in light of the effect a defendant's actions might have on a "reasonable person of the same background and in the same circumstances" as the victim.

Mohamed Toure contends that although there is evidence that he punished D.D. with violence, the evidence does not show that he punished her—by way of means prohibited by the statute—*with the intention* to secure labor or service from D.D. He also asserts that the evidence is insufficient to show that he was part of a "scheme, plan, or pattern" intended to cause D.D. to believe that, if she did not perform such labor or services, she would suffer serious harm. Mohamed Toure supports this statement by arguing that his involvement with D.D. was "episodic and his discipline of D.D. spread so widely over sixteen years that the evidence [would] not permit a rational juror to conclude that he engaged in such a 'scheme,' 'plan,' or 'pattern.'" According to Mohamed Toure, there is no evidence showing whether these incidents occurred days, weeks, months, or years apart. Thus, he asserts that no rational

juror could have concluded that he engaged in a "scheme" or "plan," or that he had the requisite mental state of *knowing* that his punishment would secure D.D.'s future labor or services.

The government counters these assertions, first arguing that the jury had sufficient evidence to determine that Mohamed Toure committed forced labor either through "threats of serious harm" to D.D. or through a "scheme, plan, or pattern intended to cause" D.D. to believe that if she did not work, she would suffer "serious harm or physical restraint."

We agree with the government. The record is replete with evidence showing that Mohamed Toure intended to commit forced labor through prohibited means. To start, Mohamed Toure retrieved D.D. from the airport when she arrived in the United States alone, as a child, on a six-month tourist visa that the Toures allowed to expire, leaving her undocumented. Mohamed Toure either beat or helped beat D.D. when she failed to perform her work to the Toures' satisfaction. He also scolded her about her work performance and disobedience.

Mohamed Toure took active steps to isolate D.D. and hide her. For example, he evaded questions from the police when they found a young D.D. banished in the park. When acquaintances asked about D.D., the Toures told them that she was their niece, or told them she was an orphan. When D.D.'s infected tooth required dental care, Mohamed Toure paid cash to have the tooth removed at a dental clinic instead of taking her to the family dentist.

In addition, the Toures did not enroll D.D. in school or educate her at home, despite Mohamed Toure never working outside of the home. Also, D.D. did not have any independent means of leaving the neighborhood, as she could neither drive nor access public transportation, and her savings consisted only of occasional gifts and money from babysitting or doing odd jobs for neighbors.

D.D. was even isolated from the other Toure children, receiving separate and inferior treatment with respect to eating, sleeping, schooling, and medical care.

In his brief, Mohamed Toure cited three incidents of his conduct—shaving D.D.'s head, beating D.D. for talking back to his mother, and restraining D.D. during a beating from his wife—as insufficient to allow a jury to find beyond a reasonable doubt that he committed forced labor. To the contrary, each of these acts demonstrate that Mohamed Toure's conduct caused D.D. to remain with the defendants because she faced threats of serious harm, or reasonably believed she would face serious harm, if she did not provide them with her labor and services. By shaving D.D.'s head when his wife was displeased with her hairstyle, Mohamed Toure contributed to a pattern of dehumanizing and abusive behavior in order to secure D.D.'s compliance. In beating D.D. and helping to beat D.D., Mohamed Toure personally employed violence as a consequence for D.D.'s noncompliance with the family's demands. Indeed, it was D.D.'s failure to prepare breakfast for Mohamed Toure's mother that led him to beat her—a clear example of D.D. suffering physical harm if she did not work.

The government next counters Mohamed Toure's assertion that he did not *know* that his actions would force D.D. to work by prohibited means. During his interview with law enforcement, Mohamed Toure stated that D.D.'s father "gave" or "let [the Toures] have" D.D., and he described D.D.'s departure from the Toure's home as an "escape." These statements implicitly acknowledge that D.D. had no choice in coming to live at the defendants' home and that she remained there against her will. These statements, combined with the withholding of D.D.'s immigration documents and failure to help her obtain new ones, would permit a reasonable jury to infer that Mohamed Toure had the knowledge and intent to force D.D. to work by prohibited means. *See United States v. Dann*, 652 F.3d 1160, 1172 (9th Cir. 2011) (concluding that

there was sufficient evidence to establish § 1589's *scienter* requirement in part because the defendant described the victim's departure as an "escape" and withheld the victim's immigration and identification documents).

Furthermore, we reject Mohamed Toure's assertion that his "involvement with D.D. and the family was episodic" such that he lacked knowledge of the means used to obtain D.D.'s labor. The record clearly shows that Mohamed Toure was personally involved in violent acts that were directly related to D.D.'s labor. For example, Mohamed Toure attacked D.D. for not preparing his mother's breakfast, held D.D. down while his wife beat her, and instigated his wife to beat D.D. by complaining about D.D.'s failure to make dinner. Moreover, D.D. stayed in Mohamed Toure's house for sixteen years. Although he occasionally took trips abroad, he never worked outside of the home. While home, Mohamed Toure benefited from D.D.'s cooking, cleaning, and childcare services. We conclude that Mohamed Toure's consistent presence in the household for so many years, and direct participation in D.D.'s abuse, amply supports the jury's verdict. *See United States v. Sabhnani*, 599 F.3d 215, 241–42 (2d Cir. 2010) (explaining that the jury's common sense and experience allowed the reasonable inference that the husband knew that maltreatment caused his family's maids to work where he observed and contributed to his wife's abusive tactics).

## IV.

The defendants also contend that the district court abused its discretion by failing to give the defendants' requested jury instruction. We find no abuse of discretion by the district court.

We review challenges to jury instructions for abuse of discretion, affording district courts "substantial latitude" in describing the law to the jury. *United States v. Wright*, 634 F.3d 770, 774 (5th Cir. 2011). A district court's refusal to give a defendant's proposed instruction is reversible error only

where: (1) the instruction sought is "substantially correct"; (2) "the requested issue is not substantially covered in the charge"; and (3) "the instruction concerns an important point in the trial" such that its absence "seriously impaired the defendant's ability to effectively present a given defense." *United States v. Daniel*, 933 F.3d 370, 379 (5th Cir. 2019). Importantly, we have previously confirmed that a "district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law." *United States v. Whitfield*, 590 F.3d 325, 354 (5th Cir. 2009).

Concerning their charges of conspiracy to harbor an alien for financial gain and harboring an alien, the defendants requested a jury instruction on what qualifies as "harboring an alien." Specifically, their requested instruction provided:

> The mere act of providing shelter to an alien, *when done without intention to help prevent the alien's detection by immigration authorities or police*, is not an offense and is not alone, sufficient to prove beyond a reasonable doubt that the defendant unlawfully harbored an alien as alleged in the indictment.

The defendants argued at trial that this language explains that concealing, harboring, or shielding means hiding something from detection, consistent with Congress's intent to proscribe knowing or willful conduct that substantially facilitates an alien's unlawful presence. The government argued that adding this language was unnecessary and inadvisable, because it was not included in the Fifth Circuit's Pattern Jury Instruction and was not drawn from criminal case law. The district court ultimately adopted most, but not all, of the defendants' proposed language. The district court instructed the jury that "[t]he mere act of providing shelter to an alien is not, alone, sufficient to prove beyond a reasonable doubt that the defendant harbored an alien." The district court thus omitted the italicized language in the defendants' requested instruction.

No. 19-10505

Although the Toures claim error, they were still free to make this argument during closing. *See, e.g.*, *United States v. Frame*, 236 F. App'x 15, 18 (5th Cir. 2007) (holding no abuse of discretion where jury instructions adequately addressed the defendant's defenses and where the defendant was free to argue those defenses during closing). Plus, per our precedent, the district court did not abuse its discretion by using Fifth Circuit Criminal Pattern Jury Instruction 2.01C to model its instruction to the jury on harboring an alien. Because the district court's instruction tracked 2.01C, *see* Fifth Circuit Criminal Pattern Jury Instr. 2.01C (2015), the only question is whether 2.01C is a correct statement of the law. *See Whitfield*, 590 F.3d at 354. Here, the defendants identify no authority or make any argument that undermines the legal correctness of the Pattern Jury Instruction. In fact, the elements of harboring in the Pattern Jury Instruction and in the district court's instruction closely adhere to this court's description of harboring in prior cases. *See United States v. Shum*, 496 F.3d 390, 392 (5th Cir. 2007); *United States v. De Jesus Batres*, 410 F.3d 154, 162 (5th Cir. 2005).

Moreover, we have previously addressed the situation where a pattern charge correctly states the law but a party requests an additional instruction that also correctly states the law. In *United States v. Cessa*, 856 F.3d 370, 376 (5th Cir. 2017), this court, following earlier precedent, concluded that a district court is not required to adopt additional proposed language—even if it accurately states the law—and does not abuse its discretion in declining to do so. We thus hold that the district court did not abuse its discretion by using a pattern jury instruction that correctly stated the law.

V.

Finally, the defendants argue that the district court erred in imposing a restitution award of $288,620.24. We find no error.

15

The TVPA provides mandatory restitution for a conviction under § 1589, and such restitution must include the "full amount of the victim's losses" as well as the "value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." § 1593(b)(3). An award under the Fair Labor Standards Act must also include back pay plus "an additional equal amount" as liquidated damages, in effect doubling the restitution award. 29 U.S.C. § 216(b).

The district court must resolve any disputes regarding the amount of restitution based on a preponderance of the evidence. *United States v. De Leon*, 728 F.3d 500, 506–07 (5th Cir. 2013). In addition, a sentencing court's "failure to give a reasoned analysis of how it arrived at its [restitution] award in a manner that allows for effective appellate review" may require vacating and remanding. *Id.* at 507.

At sentencing, the defendants objected to the amount of restitution in the Pre-Sentence Report (PSR) and explained why they believed the calculated amount was incorrect. They contend that the district court erred by nevertheless concluding, without explanation, that the defendants should pay D.D. for forty hours of work per week for the sixteen years she stayed with them. The government counters this assertion, arguing that the district court sufficiently explained the basis for its restitution order and that the record amply supported it. We agree with the government.

In reaching its suggested restitution amount, the Probation Office explained that it based its factual conclusions on evidence of D.D.'s work for the Toures, which neighbors and friends observed. The back-wage calculation itself relied on information from a U.S. Department of State agent, who stated that D.D. typically worked from 6:30 or 7:00 a.m. until 8:00 or 9:00 p.m., averaging 13.75-hour workdays. The calculation excluded thirteen weeks from

D.D.'s sixteen years in the household, presumably to account for instances when the Toures traveled and left D.D. in Texas.

At the sentencing hearing, the district court adopted the PSRs and PSR Addendums with respect to the restitution award calculation methodology but not with respect to the restitution amount. The court reduced the number of hours D.D. worked per week from 96.25 to 40, "given the arguments" at the sentencing hearing "as to DD's daily life experience." The court adopted "everything else" that went into the Probation Office's calculation of D.D.'s lost wages—"the minimum wage numbers, the weeks worked numbers, and the lodging credit number." The court calculated the amount of restitution to be $144,310.12 and then doubled it to arrive at a total of $288,620.24. The district court sufficiently explained the basis for its restitution award. It therefore did not constitute an abuse of discretion.

*     *     *

For the foregoing reasons, we AFFIRM.