# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 24, 2025

Lyle W. Cayce
Clerk

———————

No. 24-50533

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Lazaro Hernandez-Adame,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:23-CR-1684-1

_____

Before Elrod, *Chief Judge*, and King and Graves, *Circuit Judges*.

Jennifer Walker Elrod, *Chief Judge*:

Lazaro Hernandez-Adame challenges his conviction following a jury trial for illegal re-entry in violation of 8 U.S.C. § 1326(a).  On appeal, Hernandez argues that the district court committed reversible error by denying his request for a jury instruction on the definition of "official restraint."  Finding no reversible error, we AFFIRM, but we REMAND for correction of the district court's judgment.

No. 24-50533

## I

## A

Hernandez is a citizen of Mexico.[1] He first entered the United States with his mother when he was about eleven years old. According to immigration records, Hernandez became a legal permanent resident in November 1989, but that status was revoked in February 2015.[2] In 2004, a California court convicted Hernandez of "unlawful driving or taking of a vehicle" and sentenced him to 32 months' imprisonment. Upon his release in September 2006, Hernandez was placed on parole and was, for the first time, removed from the United States to Mexico. In the years that followed, Hernandez was removed from the country on several occasions.

## B

In August 2023, Hernandez once again entered the United States. Hernandez alleges that he "came to the United States for the purpose of getting arrested so that he could address his immigration status." By his account, his plan was to come "across the bridge that day asking to get . . . into the custody of the United States" because he did not "have money for an immigration attorney." Having "done a little research on [his] own and read a lot of cases where . . . people . . . trying to cross over to the United States [would] be indicted," Hernandez says he knew that he "c[ould] collateral[ly] attack [his] deportation" "to reopen [his] immigration

---

[1] "Because this appeal follows a jury verdict, we recount the facts 'in the light most favorable to the jury's determination.'" *Wigginton v. Jones*, 964 F.3d 329, 332 (5th Cir. 2020) (quoting *Waganfeald v. Gusman*, 674 F.3d 475, 480 (5th Cir. 2012)).

[2] According to the Presentence Investigation Report, immigration records reflect that Hernandez's legal permanent resident status was revoked on February 3, 2015. But Hernandez maintains that his legal status was revoked in 2007 following his 2004 conviction for the unlawful driving or taking of a vehicle.

2

case" "[s]o that [he] could get another review for [his] immigration case" and "obtain [his] legal status in the United States."[3]  Hernandez maintains that, because he could not afford an attorney, he "needed to be arrested" and "indicted" so that an attorney would be appointed to represent him in the review of his immigration proceedings.

In keeping with this plan, on August 5, 2023, Hernandez pawned his cell phone in exchange for money to purchase a bus ticket from Juárez, Mexico to the United States.  He contends that when he initially attempted to cross the bridge on foot, he encountered a Customs and Border Protection officer who told him that he "wasn't gonna be able to enter the United States" "even for asylum."  Undeterred, Hernandez purchased a bus ticket so that he could "bypass [CBP] officers posted at the top of the bridge between the [United States and Mexico]" because he knew that "when people arrive to the port of entry by bus, they are brought all the way across the bridge . . . and let out at the pedestrian terminal on the United States side."

According to CBP officers, those passengers who enter the United States by bus cross "the bridge that comes from México into El Paso" and then "get off [the bus to] be processed individually" by exiting "out of the primary building from the main building" before proceeding to the "primary

---

[3] Hernandez's immigration argument rests on his 2004 conviction for the unlawful driving or taking of a vehicle conviction, after which Hernandez faced immigration proceedings.  In those proceedings, he represented himself and was ultimately ordered removed from the United States.  Hernandez urges that, based on his understanding of the difference between "principals and accessories in the particular crime" for which he was convicted, "he should not have lost his residency for this criminal conviction."  He insists that the immigration judge wrongfully ordered him deported based on the mistaken belief that Hernandez "was a principal" to the crime for which he was convicted.

inspection" point.[4]  There is a pedestrian walkway that runs "south from El Paso into Mexico" near "the building for primary inspection where the bus [transporting those individuals] stops."  That walkway has a single turnstile which "only goes one direction"; it "turns so that if you're going south, it will turn so that you can go south" but "it won't turn the right way to let you [go] north."

The facts of what happened next are, for the most part, uncontested. As described by one of the CBP officers on duty that day:  The officer "heard someone say, 'Stop'" and "observed [] Hernandez climbing over the turnstile," so he "ran through the bus terminal" to stop Hernandez.  He approached Hernandez; Hernandez "ran a few steps and stopped" and then began "wav[ing] his arms."  He further states that when Hernandez was told to "stop," he "pretty much gave up" and "put his hands up."  When the officer reached Hernandez, Hernandez said "I give up," and that "he wanted to get arrested."

A second CBP officer arrived, and Hernandez was warned of his rights and placed under arrest.  Hernandez informed the officers that he was "a citizen of Mexico" and did not have any "documents that w[ere] issued by any legal authorities that would allow him to enter the United States." Hernandez also told the officers that he knew "it was illegal [for him] to enter the United States without these documents" but he "had been a legal

---

[4] This process is carefully surveilled.  For "operational procedures and homeland security" purposes and functions, CBP has several cameras located throughout the various inspection areas.  Those cameras are uniquely positioned to allow CBP officers to, among other things, "view the entrance that [has] the turnstile for pedestrians who would be going south back into México."  CBP has a contract with a company that captures and stores, for 90 days, "views from all the ports of entry."  When necessary, CBP officers log "into the system and based on the information . . . provided . . . retrieve th[e] cameras and . . . video" footage.

resident previously" and was "trying to come into the United States just to be in custody" for "a month or two."

C

On August 23, 2023, Hernandez was indicted and charged with one count of "Attempted Illegal Re-Entry" in violation of 8 U.S.C. § 1326(a). The indictment alleged that Hernandez, "an alien, who had previously been excluded, deported, and removed from the United States, attempted to enter, entered, and was found in the United States, without having previously received express consent to reapply for admission from the United States Attorney General and the Secretary of Homeland Security . . . in violation of Title 8, United States Code, Section 1326(a) and (b)(1)."

Hernandez proceeded to jury trial on April 1, 2024. The Government informed the jury that Hernandez was charged with "illegal re–entry" because "[h]e entered and was found in the United States." Hernandez responded that although he did not dispute the Government's factual evidence,[5] he "was nevertheless contesting the allegation that he entered or tried to enter the country illegally." His sole defense was that he "came across the bridge that day asking to get into . . . the custody of the United States" and that was "not the same as trying to enter the country illegally."

---

[5] For purposes of trial, the parties stipulated "that on or about August 5, 2023, Hernandez[] had not received consent to reapply for admission into the United States, and that on September 22, 2022, he had been removed from the United States" to Mexico. Hernandez also did not contest that CBP's cameras had captured him running "northbound on a sidewalk that is meant for southbound pedestrian traffic" at the port of entry and hopping over the turnstile to "get to the north side of the port of entry."

No. 24-50533

The Government presented testimony from several CBP officers on duty the day Hernandez was arrested.[6] At the close of the Government's case, Hernandez moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.[7] In support of that motion, Hernandez argued that the commentary to the Fifth Circuit Pattern Jury Instructions, citing *Morales-Palacios,* provides that "[a]ctual reentry requires physical presence in the United States and freedom from official restraint." Pattern Crim. Jury Instr. 5th Cir. 2.03 (2024) (citing *United States v. Morales-Palacios*, 369 F.3d 442, 446 (5th Cir. 2004). Hernandez pressed that "official restraint [means] . . . being out of custody," and because "he was never free of official restraint," he could not "be considered to have entered or have been found in the United States."

The Government countered, arguing that this court does not recognize the "official restraint" doctrine and, if we did, the doctrine would apply to only that "period of time" an officer actually sees an alien, such as

---

[6] Those officers included: (1) Lee Hancock, who testified about having seen Hernandez climb over the pedestrian turnstile; (2) Carlos Valenzuela, who testified regarding the process of retrieving video footage of Hernandez jumping over the turnstile; (3) Ambrosio Alvarez, who testified regarding Hernandez's sworn statement; and (4) Ruth Calvillo, who testified regarding the warning of rights issued to Hernandez following his arrest. Officer Javier Lopez, the case agent having custody over Hernandez's records, was sworn in but did not testify. And United States Customs and Enforcement Deportation Officer Sergio Jaramillo offered testimony concerning Hernandez's previous removal from the United States on September 22, 2022.

[7] Hernandez also argued that the Government was required to elect only a single "theory of prosecution." Because it is undisputed that Hernandez "jumped a turnstile and [] was on U.S. soil," during the informal charge conference—held outside the jury's presence—the trial judge asked the Government whether it preferred to charge Hernandez with "re-entry," "found in," or "attempted re-entry." The Government ultimately requested that Hernandez be charged with both "entered and [being] found in" the United States.

when he "cross[es] the border and the agents are there and pick him up."[8] Reasoning that, whether he was "here without restraint" is "a jury question," the district court denied Hernandez's motion for judgment of acquittal.

The second and final day of trial began with Hernandez's testimony. He testified that, *inter alia*, he wanted to enter the United States either "by being in custody . . . or through asylum;" he informed a CBP officer that he planned to "run across [the bridge] to get arrested;" and he ran "up . . . to the . . . turnstile . . . jumped over" it, then turned himself "over to the CBP." After Hernandez rested his case, the jury was dismissed so the charge could be finalized.

Hernandez initially requested that the jury receive the following instruction regarding the definition of official restraint: "Actual reentry requires physical presence in the United States and freedom from official restraint. Official restraint may take the form of constant governmental surveillance for the purposes of this instruction." But during the charge conference, his counsel advised the district court that she was willing to "take out that second sentence and just use the first one as [her] theory of the defense instruction." Her request was denied.[9]

---

[8] As discussed later in this opinion, the first of these statements is incorrect and the second is yet unsettled. However, in light of the posture of this case, we decline to rule on the substantive question of what constitutes official restraint.

[9] Hernandez's counsel lodged two additional objections to the district court's jury instruction, specifically that: (1) "the [Fifth Circuit's] pattern jury instruction . . . suggests that only one theory should be presented to the jury" but the proposed charge contained instruction on both "entered" and "found in"; and (2) it would be improper for the district court to instruct the jury on "found in" because, jury instructions are required to be supported by at least "some evidence" and there was no evidence in the record that Hernandez was "found" in the United States, he "was just there."

Reasoning that "official restraint" is not "an additional element of re-entry" and further that our circuit has not "bless[ed]" the pattern jury instructions, the trial judge denied Hernandez's request for an instruction on the definition of official restraint.  The district court advised Hernandez's counsel that if, during closing, she planned to argue to the jury that Hernandez: "wasn't trying to get himself out of custody"; was instead "trying to get in custody"; and that trying to get into custody "doesn't establish an illegal re-entry," any such arguments "would be outside the charge" and subject to objection by the Government.

The district court reconvened the jury and provided an instruction consistent with the body of the pattern jury instruction and without Hernandez's requested instruction regarding official restraint.

During closing argument, the Government argued that Hernandez established that he knowingly entered the country by testifying that he "wanted to enter the United States."  The Government further argued that once Hernandez crossed the top of the bridge, "rode a bus down to the bottom," was in the United States, "jump[ed] over [a turnstile]," was "picked up" by CBP cameras, and was taken into custody, he was "found in" the United States.  Based on those facts, the Government maintained that its burden of proof as to both "entered" and "found in" had been proven beyond a reasonable doubt.

Hernandez's counsel, without using the term "official restraint," countered, arguing that it is not "illegally entering our country to get to the first person you can find that will take you into custody."  She asked the jury to use their "reason and common sense" to determine whether Hernandez was "trying to enter our country illegally" or "trying to get into custody."  Hernandez's counsel urged the jury to consider whether Hernandez "illegally enter[ed] the country" or if he came "over here to get into custody

for the reasons" stated during his testimony.  The Government's rebuttal pointed to the charge's lack of instruction on official restraint, which the district court allowed over Hernandez's counsel's objection.

The jury found Hernandez "Guilty as to Re-Enty of a Removed Alien."  On June 20, 2024, Hernandez was sentenced to a term of 18–months imprisonment to be followed by three years of supervised release.  On June 26, 2024, the district court entered its judgment of conviction which indicated that Hernandez had been adjudged guilty of *attempted* illegal re-entry.  Hernandez timely appealed.

## II

## A

We now turn to the merits to Hernandez's appeal.  Hernandez presses only a single issue: he argues that by denying his request for an instruction on the definition of "official restraint," the district court committed reversible error.  He contends that "the district court's denial of the proposed jury instruction . . . was clearly harmful to [him] because he was completely denied a defense to which he was entitled."  The Government insists that Hernandez's "proposed instruction was not factually supportable" and that "[t]his [c]ourt has not adopted the official restraint doctrine, nor has it even 'detailed' the concept."

We must determine whether the district court committed reversible error by denying Hernandez's request for an instruction on the definition of "official restraint."  *United States v. Mollier*, 853 F.2d 1169, 1174 (5th Cir. 1988); *United States v. Duvall*, 846 F.2d 966, 971 (5th Cir. 1988).

We review a district court's decision to refuse a defendant's requested jury instruction for abuse of discretion.  *United States v. Toure*, 965 F.3d 393, 402 (5th Cir. 2020).  Our review affords "the trial judge

'substantial latitude in tailoring his instructions as long as they fairly and adequately cover the issues presented by the case.'" *Mollier*, 853 F.2d at 1174 (quoting *United States v. Kimmel*, 777 F.2d 290, 293 (5th Cir. 1985)).

In light of that "substantial latitude," a "district court's refusal to give a defendant's proposed instruction is reversible error only where: (1) the instruction sought is 'substantially correct'; (2) 'the requested issue is not substantially covered in the charge'; and (3) 'the instruction concerns an important point in the trial' such that its absence 'seriously impaired the defendant's ability to effectively present a given defense.'" *Toure*, 965 F.3d at 402–03 (quoting *United States v. Daniel*, 933 F.3d 370, 379 (5th Cir. 2019)). "The correctness of a requested instruction cannot be considered in the abstract but must be assessed in light of the remainder of the charge, the contentions of the parties, and the evidence presented at trial." *United States v. Grissom*, 645 F.2d 461, 465 (5th Cir. Unit A May 1981).

Where the district court's "instruction track[s] this circuit's pattern jury instruction," we look primarily to whether "the charge is a correct statement of the law." *United States v. Cessa*, 856 F.3d 370, 376 (5th Cir. 2017) (quoting *United States v. Richardson*, 676 F.3d 491, 507 (5th Cir. 2012)). However, "[i]t has long been well established in this Circuit that it is reversible error to refuse a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent." *United States v. Rubio*, 834 F.2d 442, 446 (5th Cir. 1987) (quoting *United States v. Lewis*, 592 F.2d 1282, 1285 (5th Cir. 1979)).

Therefore, when the district court "giv[es] a charge that tracks this Circuit's pattern jury instructions" and that charge "is a correct statement of the law," the weight of our analysis falls on whether "'the [requested] instruction concerns an important point in the trial' such that its absence

'seriously impaired the defendant's ability to effectively present a given defense.'" *Toure*, 965 F.3d at 402–03 (first quoting *United States v. Whitfield*, 590 F.3d 325, 354 (5th Cir. 2009); and then *Daniel*, 933 F.3d at 379). That is, if the pattern instruction "adequately and fairly covered the issues presented in the case," the district court did not err. *United States v. Turner*, 960 F.2d 461, 464 (5th Cir. 1992). However, "the pattern instruction [is] a 'safe harbor'" only to the extent that it "subsume[s]— 'substantially cover[s]'—the otherwise correct statement of law supplementally requested by the defendant." *United States v. Peterson*, 977 F.3d 381, 390 n.2 (5th Cir. 2020). If the "defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent" is not adequately covered by the instruction given, the district court has erred. *Rubio*, 834 F.2d at 446.

B

Under this framework, we must first look to whether the district court's instruction, which mirrors the pattern jury instruction, correctly states the law. *See, e.g.*, *United States v. Montgomery*, 747 F.3d 303, 310 (5th Cir. 2014). It does.

The district court instructed the jury as follows:

> Title 8, United States Code, Section 1326(a), makes it a crime for an alien who has previously been deported, removed, excluded, or denied admission, to enter or be found in the United States without consent of the Secretary of the Department of Homeland Security or the Attorney General of the United States.

> For you to find the Defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

No. 24-50533

(1) That the Defendant was an alien at the time alleged in the indictment;

(2) That the Defendant had previously been deported, removed, or excluded from the United States;

(3) That thereafter the Defendant knowingly entered or was found in the United States; and

(4) That the Defendant had not received the consent of the Secretary of the Department of Homeland Security or the Attorney General of the United States to apply for readmission to the United States since the time of the Defendant's previous deportation.

An "alien" is any person who is not a natural-born or naturalized citizen of the United States.

This instruction does not deviate substantively from the pattern jury instruction on 8 U.S.C. §§ 1326(a–b).

"This court has read § 1326(a) to require proof of four elements to obtain a conviction: (1) alienage; (2) arrest and deportation; (3) reentry into or unlawful presence in the United States; and (4) lack of the Attorney General's consent to reenter." *United States v. Flores-Peraza*, 58 F.3d 164, 166 (5th Cir. 1995) (citing *United States v. Cardenas-Alvarez*, 987 F.2d 1129, 1131–32 (5th Cir. 1993)); *see also United States v. Jara-Favela*, 686 F.3d 289 (5th Cir. 2012) (noting the possible role of the Secretary of the Department of Homeland Security in the fourth element of this offense). The pattern instructions, and consequently the district court's instructions in this case, closely track those four elements.

Jury instructions do not need to be a perfectly complete statement of the law to be a correct one. *Toure*, 965 F.3d at 403 ("[A] district court is not required to adopt additional proposed language—even if it accurately states the law—and does not abuse its discretion in declining to do so."). If

the instructions did incorporate every aspect of the law, it would require more from our jurors than we can reasonably expect. Learned attorneys and judges struggle with the vast amounts of caselaw that define an offense—we need only to look to this case to see the difficulty. It would take days, if not three years of law school, to fully instruct the jury on every facet of an offense. *See Sultan v. United States*, 249 F.2d 385, 388 (5th Cir. 1957) ("The Judge must submit clear and adequate instructions on the matters at issue, but it is not his function to carry on a one-day law school for the general legal enlightenment of [the] jury."). Instead, we rely on the good sense and judgment of the district courts and the thoughtful advocacy of the attorneys to craft instructions that are "correct statement[s]" of "the principles of law *applicable to the factual issues confronting them*." *United States v. Hamilton*, 46 F.4th 389, 394 (5th Cir. 2022) (emphasis added) (quoting *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005)).

C

It is that advocacy that leads us to the next prong of our analysis. We cannot simply stop at the question of whether the pattern jury instruction was correct. In certain factual circumstances, more is required than the bare statement of the statutory elements. We must therefore consider whether the instructions' correct statement of the law "subsume[s]—'substantially cover[s]'—the otherwise correct statement of law supplementally requested by the defendant." *Peterson*, 977 F.3d at 390 n.2. Again, in this case, it does.

First, this prong raises the question of whether Hernandez's requested instruction is correct. Some confusion may be appropriate: we have not "detail[ed] the concept of official restraint in a § 1326 case." *United States v. Palomares-Villamar*, 417 F. App'x 437, 439 (5th Cir. 2011); *see also United States v. Garcia-Montejo*, 736 F. App'x 94, 94 (5th Cir. 2018).

13

No. 24-50533

However, more relevant here is that we *have* expressly stated that actual entry requires "freedom from official restraint." *Morales-Palacios*, 369 F.3d at 446; *see also Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 623 n.4 (5th Cir. 2006) (quoting *United States v. Angeles-Mascote*, 206 F.3d 529, 531 (5th Cir. 2000)); *Cardenas-Alvarez*, 987 F.2d at 1133 (explaining that "[t]o graft 'freedom from official restraint' onto the crime of attempted entry would make that crime synonymous with actual entry.").

Simply put, "freedom from official restraint" is part of what defines entry for the purpose of this offense. The single sentence instruction requested, "[a]ctual reentry requires physical presence in the United States and freedom from official restraint," is the law of this circuit.[10]

We therefore must determine whether that correct statement of law is "subsumed [or] substantially covered" by the instruction given. *United States v. Peterson*, 977 F.3d 381, 390 n.2 (5th Cir. 2020). While not stated in these terms, this question has been a primary driving force of this court's analyses of whether pattern jury instructions sufficed in the face of instructions requested by the defense. In *Cessa* and *Richardson*, this court was addressing requested instructions that defined terms an ordinary juror could parse. *Cessa*, 856 F.3d at 376 ("The terms 'offer' and 'promise' are not so technical or inscrutable that a definition was necessary; the terms appear to be within the common understanding of the jury such that no instruction on the meaning of the terms was required."); *Richardson*, 676 F.3d at 507–508 (upholding denial of instruction defining term sufficiently

---

[10] Hernandez's proposed jury instruction initially included a second sentence regarding government surveillance; his attorney withdrew that sentence. This court has not yet spoken on the issue of whether surveillance constitutes official restraint, unlike our colleagues on the Ninth Circuit. *See United States v. Bello-Bahena*, 411 F.3d 1083, 1087 (9th Cir. 2005) ("It is well established in this circuit that official restraint includes constant governmental observation or surveillance from the moment of entry.").

described in the pattern instruction). Similarly, in *Turner*, the court noted that the pattern instruction "adequately and fairly covered the issues presented in the case," such that further instruction was not required. *Turner*, 960 F.2d at 464.

"Freedom from official restraint" is part of the definition of entry for the purpose of Section 1326, not an element in and of itself. We leave it to the district courts and their "broad discretion in refusing [a] defendant's proposed jury instructions" to determine whether inclusion of this definition is helpful or necessary to the jury in the context of a particular case. *Turner*, 960 F.2d at 464. This situation-specific analysis aligns with the approach of the district court judges of the Ninth Circuit: there, where "[i]t is well established . . . that official restraint includes constant governmental observation or surveillance from the moment of entry," the pattern jury instruction closely matches the instruction drafted by the district court judges of our circuit, listing only the four traditional elements of this offense and including the doctrine of official restraint only as a comment. *Compare United States v. Bello-Bahena*, 411 F.3d 1083, 1087–91 (9th Cir. 2005) (ordering a new trial when district court denied instruction on official restraint) *with* Ninth Cir. Manual of Model Crim. Jury Instructions § 7.6 (2025).[11]

D

While the second prong looks through the lens of the language itself, the third prong of this analysis assesses more broadly whether denying the requested instruction affected the outcome of the case. To make that determination, "it is necessary to look beyond the four corners of the charge

---

[11] Three other circuits have adopted instructions on Section 1326, but none have adopted the official restraint doctrine to date.

to determine if a defendant's ability to present a defense has been impaired." *Rubio*, 834 F.2d at 447.

There are instances in which denying an instruction on the issue of official restraint would prevent the defendant from adequately mounting the defense that he or she had not entered the country for the purpose of this statute. *See, e.g.*, *Bello-Bahena*, 411 F.3d at 1088–91. However, in this case, the defendant was able to raise this defense sufficiently, albeit without the term official restraint.

During opening argument, Hernandez's counsel specified that they were "not contesting" the facts in this case. Both parties agreed that Hernandez was a citizen of Mexico who had been previously deported and had not received permission to reenter. Both parties agreed that Hernandez hopped a turnstile to get to the north side of the port of entry before waving down officers. Instead, Hernandez's counsel contended that Hernandez was "asking to get into custody" and that "the evidence [would] show that that is not the same as trying to enter the country illegally."

Then, during closing argument, Hernandez's counsel argued that it is not "illegally entering our country to get to the first person you can find that will take you into custody." And she urged members of the jury to use their "reason and common sense" to determine whether he was "trying to enter our country illegally" or "trying to get into custody." Hernandez's counsel also asked the jury to consider whether he "illegally enter[ed] the country" or if he came "over here to get into custody for the reasons" stated during his testimony.

While it is true that Hernandez's able counsel did not use the term "official restraint" in either the opening or closing arguments, she framed the argument around this issue. It therefore cannot be said that the absence of the instruction "seriously impaired the defendant's ability to effectively

present [the] defense." *Toure*, 965 F.3d at 402–03 (quoting *Daniel*, 933 F.3d at 379).[12]  As such, the district court made no reversible error in denying the instruction.  Nevertheless, we remind the district courts that the pattern jury instructions can and should be modified as needed to fit the facts of the case before them.  However, under these facts, any error in refusing the instruction was not reversible error.

## III

Accordingly, the district court's judgment is AFFIRMED in part and REMANDED in part[13] to correct a clerical error in the district court's judgment.

---

[12] Hernandez points to a moment during closing arguments where the government suggested that the official restraint doctrine was not a defense to the charge.  The jury heard the official restraint argument, and the district court directed them to the charge, which, as we discussed above, is a correct statement of the law.  While we may have ruled differently, we cannot say that the district court abused its discretion in directing the jury toward its instruction.  If the district court erred, any error was harmless in light of the fulsome argument Hernandez's counsel was able to make in support of his position that at all times he was in custody and intended to be.

[13] We remand for the limited purpose of correcting a single clerical error, the offense for which Hernandez was adjudged guilty, in the written judgment pursuant to Federal Rule of Civil Procedure 36.  *United States v. Cooper*, 979 F.3d 1084, 1089 (5th Cir. 2020) (citing *Ramirez-Gonzalez*, 840 F.3d 240, 247 (5th Cir. 2016).  The nature of the offense should be "Illegal Re-Entry," consistent with the jury's verdict not "Attempted Illegal Re-Entry."